FILED IN THE
COMBINED COURT
DOUGLAS COUNTY, CO

2019 JUN -4 PM 2: 40

| District Court Douglas County, Colorado<br>Court Address: 4000 Justice Way, Castle Rock, CO 80109 | DATE FILED: June 4, 2019<br>CASE NUMBER: 2019CV39<br>▲ COURT USE ONLY ▲ |
|---|---|
| Plaintiff(s): Michael L. Macgowan Jr. , Pro Se<br>PO Box 4061 Parker, CO 80134<br>V.<br>Defendant(s): Defendant(s): Town of Castle Rock, Colorado, Mayor Donahue | |
| Attorney or Party Without Attorney (Name and Address):<br><br>Phone Number: 303.818.6245 Email: mmacgowa@yahoo.com<br>FAX Number: Atty. Reg. #: | Case Number:<br>19CV39<br>Div 5 |

## COMPLAINT

1. Plaintiff comes before the honorable District Court of Douglas County, Colorado to remand an application for a "Combolisk" back to the Town of Castle Rock, Defendant. In the alternative, Plaintiff seeks a judgement against said Defendant for censoring the free speech and loss of use of the leasehold interest in the real property as indicated in the Sworn Affidavit. The original application (attached), for a free standing off –premise billboard upon which a building permit was denied on May 2, 2019 for said Combolisk outdoor free speech structure. The attached letter from Defendant's representative, Zoning Manager Tammy King, indicates a final order was made following a public hearing denying variance in its entirety. Separate variances were requested for off premise use, maximum sign area allowed for a property of the size represented by the property in question, maximum sign size for the zone, and maximum height. Said order represents a final order to be judicially reviewed by the district court as indicated in the attached letter Board of Adjustment BOA18-0009 – 732 Jerry Street dated May 3RD. This petition for review, cover sheet, and court fee are filed within the 35 day limit, as set by the court, to challenge said order. The attachments include the final order, affidavit of process, original application and a sworn affidavit.
2. The final order for BOA189-0009 is based on an application for an off-premise sign. Said application (see attachments) did not receive constitutional considerations by the city. There are issues with due process, equal protection under the law, free speech, denial of assembly, abuse of power and lack of just compensation. The decision also discriminates against age and citizens with visual challenge.
3. This request for review is filed pro se and is a case which touches the fundamental rights for humans in establishing written free speech. The First Amendment, giving the people the right to speak against a rogue government and the right to bear arms are the people's defense



of humanity. Thus every barrier to free speech is cause for an imbalance in a democratic republic where the government is supposed to serve the people. Although the safety of the public and pursuit of life and liberty necessarily limit free speech, even the value of safety must be carefully considered before an authority may impose a process to limit free speech. In the event that a second value is proposed to limit free speech, it must be the consensus of the people rather than simply a law which serves a minority group. And when the value limiting free speech is proposed and supported by the people it must accompany a method to justly compensate for the loss of use to the citizens holding current and future opportunity or use that has been withheld. This is the fundamental relationship between free speech and just compensation. Precedent has held in this direction but has been clouded by politics and the commercial speech of corporations in creating case law to preserve our constitutionally held values.

4. The outside public space and broadcast to moving people is the most important use of free speech given the growing population and diversification of venues that divide the attention and opportunity for speech. Local traffic represents the single most important opportunity to reach the local audience in addition to the national capabilities of multiple broadcasts among outdoor traffic sites and potential for assembly at high speed.

5. While there are limitless opportunities to solicit the attention of citizens in the hopes of presenting free speech, the nature of broadcasting to the traveling public predates not only the United States, but is recorded before zoning and many fallen governments. The Greek civilization used Obelisks to broadcast to the traveling public as the first recorded use of a structure independent of zoning regulations and inherent to all real property. As indicated in the sworn affidavit (SA), the term Combolisk is a new use which transcends old zoning concepts and uses the Obelisk as a base to the inherent right in the real property. The famous display and quote of Paul Revere is an example of an inherent right to free speech, and, combined with the right to bear arms, is the counter to government and link to the Obelisk in the formation of the United States, "One if by land; two if by sea." This outdoor public broadcast act was contrary to the established government and why speech must be free of governmental regulation when possible. We might not be a nation today, if Paul Revere and company were forced to obtain a permit to put lanterns in a church steeple. Similarly, citizens must be free to display messages on vehicles, display tarps with words over hay, paint on buildings and place hay bales next to thoroughfares with tarps to preserve the right to broadcast. While these may be done without permit, it is the act of placing a permanent structure in the ground that crosses the safety value threshold and requires third party verification to ensure the safety of the motoring public.

6. The Combolisk project is a two part process to establish a new self-regulated system within the public display space. This application represents the first phase in which a for profit business establishes the Combolisk use by sworn affidavit to fund the development of an overseeing organization to manage the outdoor display space as a permit for billboard in a jurisdiction that prohibits billboards. The first phase challenges Defendant with a prohibitive off premise ordinance. The second phase includes recording necessary building code compliance elements with public record keeping challenging the government's need to restrict speech for the value of safety.

## 14th Amendment Due Process

7. The application was denied due process. The original application was never denied. Plaintiff asked for and did not receive a final appealable order as indicated in the letters (4/24/17, 10/3/17) and emails (10/10/18). This was in part due to an implausible requirement to require expensive structural engineering requirements before zoning approval (email 11/14/18)
8. Zoning Manager King indicated the path to a final order was by variance (email 11/14/18). Manager King indicated that the variance items to be requested would be based on size of the proposed sign, height of the proposed sign, and size of the sign based on size of the lot. There was no mention of the need to obtain a variance for the nature of the use as off premise, even though the original application (attachments) clearly states it is for an off premise use.
9. Off premise use did not become an issue until staff determined it was an issue. It should have been listed as an element in the August 10, 2018 letter from Defendant. The application should have been denied with a final order that could have been reviewed in court. There was no indication that off premise was an issue until after the variance hearing had been advertised and posted on site. It is a denial of due process to make a change to the need for additional variance once the determination of needs of variance had already been given to the Plaintiff, especially in light of the delay made to accommodate a new hearing date. An objection was made when the issue was brought to the attention of staff in the emails and variance hearing section on due process but Plaintiff was forced to have a variance hearing in order to receive a final appealable order. The case must be remanded as a result.
10. A variance hearing was the only way to obtain a final order. It was completely unnecessary and an expense forced to receive a final order. By its definition, a Combolisk is inherent to all real property. It would not be unique to any property as it is common to all properties. Since the Defendant's ordinance does not address Combolisks, the case must be remanded to the city for consideration to the ordinance. The city would then have to declare interests of the city to limit Combolisks, and provide proof of validation by the public that warrants a limit to free speech and just compensation where lost, as it is inherent to each property in the city. Failure to meet this burden would be unconstitutional.

## 14th Amendment Equal Protection Under the Law

11. The city has no process for censoring speech between on premise and off premise. Traditional methods for broadcasting outdoor speech require a physical process with paint or material to modify the display face of a sign structure. This was done using equipment to change out a face made of nonflexible materials, commonly painted and placed on the sign structure or posted like wallpaper into place. The digital nature of current signs has changed the process to where the content can be manipulated electronically off premise and in seconds with minimal if any cost. This dramatically changes the existing outdoor speech precedents as it frees up opportunity for less expensive production costs. This in turn creates a more reaching opportunity to hinder the nonprofit community with legislation limiting digital displays.
12. The emails indicate that when this was brought to the attention of staff, Manager King (11/14/18) indicated there is no method for determining whether an applicant complies with the nature of the application until a complaint is made. This implies that there is no equal protection for citizens regarding the nature of on and/or off premise use. The case must be

remanded to address this issue in the code and application process. Without a permit to change copy or a method to monitor use, all digital signs must be equal and not subject to content restrictions.
13. The Defendant cannot deny an application for off premise use and then use off premise advertising on its own sign. In the Sworn Affidavit attachment, SA.2 indicates a picture of the digital sign outside Defendant's building indicating off premise advertising for social media corporations in violation of the off premise use prohibited by same Defendant. Further, the city cannot prevent other digital signs from utilizing similar use for advertising the incidental use of products for sale on site, political messages, even for profit messages. This case must be remanded back to the city.
14. Technology has created an impossible realm to manage outdoor broadcast space. A strict interpretation of a prohibitive ordinance, like Defendant's code, would recognize that even cell phones are illegal without a permit. Cell phones display advertising content paid for by advertisers and supported by the phone operators that have contracted space to display ads with people who use the phones. It is similar to a leasehold contract of a billboard. Even indoor, they are in violation of the ordinance. A permanent or larger display should only be regulated for safety unless the code is to regulate down to handheld use of citizens and be prepared to compensate for the loss of use.
15. Even if the Defendant argues that the difference between a sign and a personal electronic device is a permanent structure and declared use on an application, many televisions violate the code. While it could be argued that televisions are inside the home and are not permanent structures requiring a permit, technology has changed the way citizens view television and computer monitors. When a mount is installed for a device, it becomes an in home permanent structure, no different from a commercial billboard other than in how many viewers will see broadcasts. In fact, there are junior panels, indoor displays, bus shelters, and bus benches in the billboard industry that are similar in size to a large screen televisions. The city cannot ignore the issues with off premise permanent structures in homes and businesses without equally allowing a permit for an off premise billboard that is a declared use.

## 1st Amendment Free Speech

16. Defendant has failed to adjust their municipal code following the (*Metromedia v. San Diego 1981*) Supreme Court decision. Their code (SA.4) makes no provision for billboards. There are no "billboard" standards (SA. 5,6) in the industry that would support a sign smaller than 40 square feet as provided for as exception in the ordinance. The first issue in public speech is understanding the difference between speech and commercial business identification. There can be no argument that most of the public will see a curved yellow M with varying width and identify that the business below as McDonalds. Phrases of speech are not identified with a single letter or even a word. A billboard is larger because it displays three to five words optimally rather than a single word or logo. Thus any provision for off premise or speech must start at a size that is at least five times greater than that of the business identification code. Further, the code must identify the variables associated with distance to the speech and speed of the motoring public. Defendant's code does not meet the minimum requirements for speech at the proposed location and must be remanded.
17. Authorities that have applied the Metromedia precedent typically have an ordinance that identifies on premise use vs. off premise billboard and have different sizes and standards for

each. They recognize that the billboard industry has a long history of success by identifying three to five words with a picture as a viable way of reaching the traveling public as an audience for promoting the sale of goods and services not located on the property where the billboard is located. It is no different for the nonprofits that use billboards as a medium of communication. They must be afforded the opportunity to present a message to travelers driving the speed of traffic while being able to read the message. The minimum standard of speech is the standard outdoor billboard presented in the application and attested to in the SA.5,6. At best, any off premise signs Defendant allows are incidental like those rejected in Metromedia. The San Diego incidental uses were found to be unconstitutional. The forty square foot exception would permit most television installs if required and for less than back to back sheets of plywood. It must be rejected for speech.

18. The plurality opinion in Metromedia indicates that the billboards are a recognized means of communication. This entails that at least a minority of nonprofits currently use sizes and types of content that must be applied to at least industry sized standards, if not as billboards themselves, to post the preprinted materials that already exist on the shelves of nonprofits or billboard operators to be displayed at a future date. Thus the ordinance must yield to the outdoor standards that have already been established or at least yield to digital standards that will host existing nonprofit messages without modification, or the same arguments from the Metromedia case apply. Failure to apply the standard of Metromedia would create undue hardship and most assuredly be reversed in appeal in Colorado, let alone federal scrutiny. It is discrimination against all nonprofits to reject billboard standards when considering that digital scaled images can be stored on any digital device and can await broadcast to a display structure. Further it would be an unnecessary hindrance to speech to force nonprofits to modify said copy to fit a nonstandard size. Thus the application in question is the smallest industry supported size and standard for freeway broadcasts similar to the real property described in the denied application.

19. Defendant has not addressed the fundamental nature of the "Combolisk" as a new form of communication. Although new in definition in combines literally centuries of use and precedent. The Combolisk begins with a claim to an inherent right to the Greek Obelisk, which as Justice White points out in the Metromedia precedent, extends the question of First Amendment rights broader". By definition the Combolisk suggests that a permanent structure extends beyond zoning as speech. It also forces a new communication medium that preserves the pubic broadcast space for free use by nonprofits. At a minimum it defines that the first and every eleventh message be free to nonprofits (SA1,7). While billboard operators may offer free space to nonprofits at times when billboards are not sold, or sell broadcast space on an available basis for rate or discounted, there is no outdoor broadcast medium in known existence that defines a minimum for providing free space to nonprofits. As such, this application must be considered as new and become a new standard in legal history with provision for expanding as required by precedent.

20. The Combolisk establishes itself as a medium of digital nature with size and stature compatible with existing off premise use billboard use. Not only is the art copy able to be transferred from billboards to Combolisks without change by thousands of pieces of content already in existence, but the Combolisk allows for a path of conversion from existing billboards to Combolisks. Once stage 2 of the Combolisk Project has validated a process for monitoring the structural needs for install and record keeping of Combolisks as well as rules for preserving the value of the public display space, self-regulation will promote the

conversion of billboards to Combolisks. Operators agreeing to use restrictions based on population rather than zoning and minimum community broadcasts by definition will ensure the preservation of the public space. Said preservation is a broader picture than has ever been suggested.

21. As White concluded in overturning San Diego, the court must overturn Castle Rock and declare its' ordinance unlawful because it does not provide a method for obtaining a permit for a Combolisk, denied a variance for a Combolisk and discriminates against the billboard nonprofit artwork that would be broadcast from a Combolisk. This is especially true when the court considers that draping a billboard over a stack of hay bales, painting a message on the side of a billboard or putting a digital tv in the window of a building orientated to the road are uses that would be illegal under the ordinance yet are those which cannot be regulated.

22. Industry self-regulation is the only real answer to the commercial nature of the outdoor broadcast space. Government should not be in the business of regulation. The very nature of creating legislation to restrict commercial speech has to interfere with free speech. The only answer is for the government to remove its restrictions or to promote a third party solution, like the one proposed in the Combolisk. The industry has the option to regulate itself, but won't, as it is not in the interest to do so. Even the Highway Beautification Act has failed in its original intent. Rather than remove eye sores, grandfathered locations remain for lack of funding to remove them through just compensation. The industry has been given an oligopoly of use and prevented from converting aging old billboards to new aesthetic standards.

23. The application of a newer court precedent is even harder to justify regulation of the Combolisk. To the lay, *Reed v Gilbert 2015*, indicates an authority must define its value gained and prove the value in order to justify limiting free speech. Gilbert did not prove any value could or could not be gained at different times, resulting in the code requiring temporary signs to only be displayed at certain times. It was unreasonable to suggest that the value could be held during the non-allowed times and thus the case was remanded.

24. The Combolisk applies the Reed test and goes further. By itself, a permanent structure of the size and stature of a billboard must be allowed by Metromedia precedent. At this point the authority is left to censor the blank time between nonprofit broadcasts. Since the authority has no process in place to restrict content to businesses conducted upon the premise and has no hope in doing so by violating its own ordinance on its own digital sign, the denial of a Combolisk is unconstitutional and discriminatory. The application for a digital speech structure should allow at least the billboard standard for the applicable frontage to a freeway and allow all speech less those that would endanger the public.

25. This case is specifically designed to expand the definition of Gilbert by extending to the evolving digital nature of signs. There is a mechanism in place to change content electronically via wire or wireless through electronic means or the Internet, resulting in no cost associated with changing display content. Unless the government wants to get in the business of censoring all speech twenty-four hours per day, all days would be left with the overwhelming cost of doing so, in addition to the difficult task of deciding which restrictions are content neutral. The bigger issue is that if the value to be gained is beautification and not censorship/restriction of speech, there can be no argument left to force the display to be left blank between broadcasts, especially in light of the fact that digital signs are more expensive to erect and maintain. Rather than give the more valuable advertising space away

to nonprofits, digitial operators have a greater incentive to advertise their own availability rather than donate open space to nonprofit use. Thus the public use of the public space is reducing. The Combolisk reverses this trend and preserves the space while providing a new opportunity beyond those in existence.
26. The Combolisk extends the reach of free speech by partially utilizing the existing model for public broadcasting television and radio. While there is no inherent license in utilizing air waves which are government property, public space is public and the Obelisk now Combolisk, is inherent to real property. Commercial paid broadcasts are an integral part of the algorithm for the Combolisk, which requires substantial money to erect and maintain a digital display structure as well as pay a handsome fee for property placement and leasehold interest along interstates and thoroughfares.
27. Combolisk is unique. No other new term for an outdoor display can combine free use with the inherent right to display on real property. The SA indicates that an overseeing nonprofit organization will manage all future Combolisks from the profits of the first Combolisk; consequently, there can be no other combining of uses that will create a proliferation of outdoor broadcast terms. Combolisk is, however, a unique combination of terms promoting an inherent right to real property and required nonprofit minimum use. It therefore becomes discrimination against all nonprofits for each and every Combolisk that is rejected by zoning ordinance.
28. The Combolisk Project is designed to specifically address the value an authority can hold and use to restrict free speech. It challenges those definitions in the hope to return to a most clear standard of free speech like that used in Paul Revere's ride. The problem has been that authorities have really confused the issue with the regulation of commercial speech. Now a decision into free speech must go forward in the digital realm by recognizing the inherent right to land with a permanent structure that is paid for with commercial broadcasts to stand ready against government if necessary. Simply put, the transportation departments of counties, states with federal government as a whole, operate a "system" of digital speech and highway logos along the interstate. The people have a right to counter this system with a system like that proposed in the Combolisk Project. In a democratic republic where the government serves the people, an alternative network digital display system operated outside the government must be allowed to counter. It is in interest and preservation of the value of the system that it be managed to the benefit of said value, with the premise that it serves the people as its base and is ready in a coordinated effort to be used against the government if necessary as is the right to form militias with guns. Both are necessary components of a free society. This case must be remanded to allow for the Combolisk Project.

## 1st Amendment Right to Assembly

29. Defendant has denied the right to assembly. By limiting their code to forty square feet for any sign, they have effectively denied assembly for speech.
30. A forty square foot display area might be acceptable for a single business identified on a surface street. Realize that this size is about the same size as a standard television in a home which is meant for a small gathering of people in a room viewing moving images on a screen. Simple math would take the measurement from forty square foot for one word to two hundred square feet for five words. Double this amount for moving from a room inside a home to an image that can be read across the interstate and the calculation exceeds the

requested amount. Double again for the image to be read while vehicles are traveling at speeds in excess of seventy miles per hour and one will quickly realize that the ordinance had no thought when passed in regard to allowing for a community of people to assemble and pass by locations to view words or pictures as speech at highway speeds. This results in right to assembly being denied. The case must be remanded as such.

31. The Defendant's sign code is arbitrary. Upon multiple requests for the values and process to prove the values used to validate the hindrance to free speech, there was no response. The Reed decision and increased use of digital signs should force all authorities to reconsider sign ordinances. It is not enough for a minority of interests in city council, or building departments to suggest and vote to create code to limit free speech. Since it is so fundamental to the preservation of a free people, the courts must reject code that does not have a process that identifies and measures values to be gained by limiting speech and then compensates real property for loss of the inherent right to the Obelisk. The public must know the real costs associated with limiting speech both in monetary value cost as well as the limitation to speech and assembly of a system counter to the government.

32. The code speaks to safety, yet the application was to locate the projecting portion of the structure at a point above the use of the property to prevent damage to the motoring public. The code cannot speak to safety and also deny a legitimate use without accounting for making the use safe. Not allowing the bottom of a projection below to be above fourteen feet puts the public in danger of standard motoring transports at thirteen feet eight inches in height. If safety is the value the Defendant is trying to hold, then shouldn't a variance system consider exceptions for safety? The code is arbitrary and violates its premise for restricting free speech. It must be remanded.

33. The application was just and sufficient to place the viewable portion of the structure where it could be "seen" by the traveling public also negating the height variance restrictions. The Defendant cannot value the use of speech and then restrict it to where it is not viable as a use. The code is arbitrary and violates its premise for allowing speech even at the forty square feet exception.

34. The application was for a back to back display. The code cannot value beauty and then create a code that provides for the entire allowable display space to be located on one side. What is the value in looking at the back of a single sided structure? What value is gained by an applicant utilizing all the allowable display area to make a display large enough to be seen and read by the traveling public while leaving ugly on the backside? The application of the Reed precedent would thus allow an applicant to force the code changed to accommodate a maximum size of the display face on one side without restriction to the opposing side unless the people are willing and able to pay for the loss of use on the other side or sides given that Obelisks were four sided pillars permanently erected on real property. The case must be ramanded.

35. Denying the Combolisk could be the greatest hindrance to the right to assemble since the time the country was founded. Equalfoot is a proposed extension of the nonprofit side of the Combolisk Project, giving free broadcast space to applicants for government office positions. With a coordinated effort between local, regional and national vacancies in office, the Combolisk represents the single greatest opportunity for the people to elect people with ideas to benefit the good of the people rather than preference for minorities with money and power that affect election results through influence of the media. Even the system of allocating funds for presidential office negates and discriminates against minorities,

independents, and parties that do not have opportunity to reach the people until their reach is five percent of the voting community. A denial of the Combolisk Project discriminates against all the political candidates that do not win their seats to office and is thus unconstitutional. The Combolisk Project is an extension beyond all known media in history because its base in community allows for the free use of the poor to become candidates for national exposure. The system will accommodate a provision for local, state and federal considerations. Thus the case must be remanded to prevent an abuse of power in favor of existing authorities and illegal restrictions.

## Abuse of Power

36. In a democratic republic by the people for the people, intent should be to create law to benefit the people. The intent should be to work for the people when the intent is clearly demonstrated as working for the people. The Combolisk project is to modernize and preserve the public broadcast space for the public. The Defendant should have acted to find a way to help rather than hinder the project.
37. SA.9 indicates that there is no real need to restrict free speech. The uniform building code is sufficient for authorities to prosecute sign operators for installing and maintaining substandard structures. Further hindrance to free speech is for the benefit of control over the public space and is abuse of power without approval by a majority of the people and just compensation for the loss of the Obelisk inherent to all real properties.
38. Initially (SA.3) the Plaintiff presented the project to city council and raised the issue of free speech, stating problems with compliance with the known precedents of Metromedia and Gilbert. The response should have been to approve the project or offer a review of the code to find where it would or would not allow the project. In the least, it should have offered to modify the code in order to accommodate a new type of development that puts community first. After years of presenting the project, the Defendant has not addressed the constitutional issues presented. This is the beginning of tyranny and represents the loss of the most basic of human rights to life, liberty and the pursuit of happiness. The case must be remanded to resolve the abuse of power.

## Just Compensation

39. Restricting free speech has come at a price. Since Obelisks predate the concept of zoning, they must be regarded as having inherent rights in real property. Before limiting Obelisk use, the government must create values through investigation with the public. This must include the transmission to said public that preventing the inherent use will have the consequence of providing just compensation to real property owners and leasehold interests in not allowing said use.
40. SA.7 indicates the process Plaintiff, through a nonprofit, solicited the fifty states to find extract the value of beauty used to justify the regulation of billboards as speech and the threat of withholding federal highway funds to force compliance with the federal Highway Beautification Act. There is no data to justify beauty in all fifty states. While the Metromedia decision may be late to the history of Obelisk use, it demonstrates a level of tyranny that has blocked free speech in the interest of an individual or minority rather than the public. It was Lady Byrd Johnson that pushed to control billboards, not an elected

official. This decision began the push to restrict free speech without taking the issue to the public. While one could argue for controlling speech to prevent unlawful or dangerous activities like yelling fire in a crowded auditorium, a value such as "beauty" should be taken to the people. And the people must understand in their voting that removing an inherent right to the land has a cost associated with it. If the public deems it necessary to create aesthetic beauty to promote regions with no or controlled speech, then it must be willing to pay landowners and leasehold interests for the value of the lost opportunity. This would include existing uses along thoroughfares coupled with future uses along future thoroughfares because the value is intrinsic to the real property based on the population served. This is why one justice suggested in Reed that the whole Beautification Act could be subject challenge. This is in part why the Combolisk Project was designed.

41. The proposed self-governing Combolisk Project supports proliferation based on population rather than zoning. While it may have been evident in the sixties that there is a difference between lands and their zoning use, that same designation is dwarfed by actual use today. Residential property next to a six lane interstate has less value than the same dirt separated by a buffer zone or gated community. Often this is not addressed in zoning creating a burden on landowners at a short distance to thoroughfares as opposed to those with more distance. The landowner plagued with sound and access issues should at least have the ability to speak to the traveling public , if not receive an income based on the Combolisk project. At least some loss of value in real estate should be offset with intrinsic value of speech or a new discrimination is at hand. While the poor are forced to take the worst real estate, it is even the poorer and indigent that end up under the bridge or on the properties adjacent to the most traveled byways.

42. The values of beauty and safety have been used improperly to escape just compensation. If signs, especially digital signs, were dangerous, then they wouldn't be used by the government in construction zones in the right of way. There is no real issue with safety because billboards have a history following the Obelisk. They are a factor facing the traveling public and the public has adjusted. While it may theoretically seem like blight or a safety issue by having a billboard on every property, a self-regulated market that preserves the value of the public space by forcing the donation of broadcast time to nonprofits solves the issue. This can be accomplished in Phase 2 with an overseeing organization that records the data associated with the construction and maintenance of Combolisk broadcast units and rules to preserve the value. Once the values of safety are eliminated, the value of beauty is exposed for what it is. Operators, commercial interests and the public can work together to preserve the value of the public space and place limitations on speech rather than the government. The cost and operation of Combolisks is expensive. Thus if no commercial interests will offset those costs, it becomes difficult for all property owners to have Combolisks if real property owners have the right to install Combolisks but they are not supported by the members that are following rules to preserve the space.

43. The value of beauty has proven to be of minimal value to the people. Beautification has failed in its original intent. It has created an oligopoly of billboard operators that receive higher revenue for substandard structures. Rather than adjust to aesthetic modern standards, many turn of the century A-frame structures still exist as neighboring properties are excluded from obtaining permits for billboard use. They exist because they are grandfathered as nonconforming uses. They are not removed because the people are not willing to foot the bill for just compensation to remove them. Thus the minority of people

that don't like billboards are the vocal minority group seeking to persuade authorities into creating restrictive codes to approve or limit Defendant in eliminating off premise billboards without regard to giving up their inherent right to the real properties in their jurisdictions. The public was never given the opportunity to vote on the beautification issue. The feds forced compliance or face the loss of ten percent of highway funds. Regional and local authorities then followed suit with more restrictive ordinances without addressing compensation of the loss of the Obelisk inherent use.

44. The history of abuse of speech by the federal government without validation and sufficient just compensation to apply a standard of beauty is the hardship for every landowner to justify a request for variance in order to simply restore lost opportunities. Again, the discrimination comes at the cost to those that are less financially able to fight the goliaths of oppressive governments and the oligopoly of the industry.

45. SA.8 indicates the fair market value for the Combolisk leasehold interest. If the city denies a permit for its use, the court should enter a judgement for the lost value to the real property. The value is stated in the SA and has been suggested multiple times in the record without even acknowledgement by Defendant. Failure to even acknowledge a claim is evidence itself of tyranny and how far our local governments has strayed from the basic human rights laid out by the founding fathers in our constitution.

## Discrimination

46. The aged and those with visual challenges are discriminated against by Defendant. This action, in and of itself is enough to remand the case back to the city. Without a provision in the ordinance to allow for speech versus business identification, along interstate and primary highways, those with difficulty reading at distance coupled with those that have naturally lost their ability to see at distance, are at a disadvantage and discriminated against.

47. The minimum standard for viewing speech has been argued above. The discrimination would extend to the need to accommodate size and height of broadcast structures to allow the broadcast copy to be seen. A speech sign that is larger than a business identification sign would require separate code to address the need to ensure a safe operating environment for motorists and users of the real property.

48. The use of the property under question is a car wash. The height on the application is a reasonable accommodation to ensure that vehicles using the car wash can drive under the bottom of the display face without incident and that the copy can be read from the traveling public. Failure to provide accommodation for the proposed dimensions would discriminate against users of the property and endanger the motoring public. Application of the Reed standard would question why it is necessary to restrict free speech to the point that the speech would create a safety hazard. The court should remand this case back to the Defendant.

## Conclusion

49. Plaintiff grew up in the billboard industry (SA.5,6,9). Plaintiff remembers visiting a billboard that had recycle bins underneath. Plaintiff's father always believed operators needed another reason to exist on the land. Plaintiff began his career folding paper and putting paste on paper to be posted on billboards. Some of these were preprinted and

shipped in bulk to operators throughout the country hoping to find an open space and a friendly manager to post them for free over open space. This preprinted public display space is being lost due to replacement by the self-promotion of available broadcast time slots in digital displays. The free public space is being lost due to these new technologies demonstrating a lack of opportunity to promote free speech. This is especially true given that all states have done little or nothing to validate the tenets of their code. Tyranny is the result of the taking of free speech without just compensation.
50. Government must recognize the inherent size, scope and nature of the Obelisk and their right to exist on real property embracing the Metromedia standard "billboards". A tarp with words over hay bales on top of a car wash are not regulated but using the same height and display area with electric bulbs to change copy through a request of permit for the community using a permanent structure is unlawful? Law must create values, test and create measure with the public in defining those values and compensate for loss of the right to real property interests when those values interfere with the inherent right in real property.
51. The entire realm of properties in which to place permanent broadcast structures is being lost, yet there are new roads each year. An unverified value of beauty has created a firestorm of legislation against broadcast sites and an unnecessary application of safety to hinder free speech structures. No process of compensation has informed the people of what they have lost. The only hope for free speech is to return to the constitution, even though authorities like Defendant have failed to address their codes in the wake of landmark decisions like Metromedia and Reed. Abuse of power and lack of holding to the tenets of free people hinder free speech in tyranny rather than a democratic republic.
52. The Combolisk Project can move forward with a return to the Constitution. Recognizing the building blocks of the Obelisk and putting community first provides the people an opportunity to preserve their heritage while providing a communication system that reminds the people of the great freedom they have.
53. The values for the Defendant, if even stated, are arbitrary. There has been no testing or evaluating the code to assure that the stated values are met and that loss of opportunity is compensated. The process for exception does not consider the Combolisk Project and is thus unconstitutional.
54. The Defendant has not considered the known applicable precedents that are relevant to this case. Failure to even acknowledge them in the application process is an abuse of power. Failure to apply them is a travesty to justice.
55. The Plaintiff would profit if the rightful just compensation is awarded from this case. This would not necessarily serve the people although this case would be a precedent at least in Colorado to challenge similar restrictive ordinances. The only other option to prevent discrimination and relieve the burdens on free speech is to remand this case back to the Defendant until the application is approved and that the code is amended to recognize the Combolisk Project.

The information contained in this pleading is true, complete and concise to the best of my ability. Sworn to this first day of June, 2019.

Signed _____ /s/ Mike Morgan _____, Plaintiff

CERTIFCATE OF SERVICE

I certify that on June 1, 2019 a true and accurate copy of the COMPLAINT was served on the Defendant by certified mail.

